JOURNAL ENTRY AND OPINION
{¶ 1} Defendant Iran Doss (appellant) appeals his rape and kidnapping convictions. After reviewing the facts of the case and pertinent law, we vacate the convictions and order appellant be discharged from prison.
 I {¶ 2} On the night of December 31, 2004, 23-year-old J.P. celebrated New Year's Eve with friends at Club Moda near downtown Cleveland. It is undisputed that J.P. consumed alcohol during the course of the evening. J.P. remembers being on the dance floor shortly after midnight, when what she describes as a "black curtain" came down over her. J.P. does not recall what happened from that time until approximately 8:00 a.m. the next morning, when a woman she did not know shook her awake. J.P. was in a strange bed, and she was not wearing her own clothing. She was also nauseous, disoriented, and bruised. *Page 2 
 {¶ 3} J.P. noticed a man in the room, who she later identified as appellant.
The man and woman told J.P. to clean herself up, then drove her home. During the drive, the woman told J.P. that she and appellant had found her intoxicated at the bar, that J.P. did not know where her friends were, and that they had taken J.P. home with them to be good Samaritans. The woman also mentioned a man named Tyson, whom J.P. did not know. The woman gave J.P. a napkin with the name Eileen and a telephone number on it, stating that J.P. should call her sometime. According to J.P., appellant did not say anything to her.
 {¶ 4} After she was dropped off, J.P. continuously vomited, and when she urinated, she experienced pain in her vaginal area. J.P. called a friend, who took her to the hospital. J.P. was given a rape kit, and the police arrived to question her. No drugs were found in her system, and DNA tests later revealed that semen found on J.P.'s underwear belonged to Tyson Simpkins (Simpkins), a bouncer at Club Moda who was working that night. Simpkins pled guilty to abduction and sexual battery.
 {¶ 5} Using the napkin given to J.P. with the name and number on it, the Bedford Police subsequently located Eileen Wiles (Wiles) and her boyfriend, appellant, both of whom J.P. identified from photographs as the man and woman in whose apartment she awoke and who drove her home. *Page 3 
 {¶ 6} On January 20, 2005, appellant gave a written statement to the police regarding the incident. In the statement, appellant recalled that as he and Wiles were getting ready to leave Club Moda around 2:00 a.m., they noticed that J.P. was there, apparently intoxicated and without a ride home. She was unable to give directions to her home, so appellant and Wiles decided to take J.P. to their place to sleep and then drive her home later that morning. Specifically, the pertinent parts of appellant's statement are as follows:
 "So I told the girl that we would take her home in the morning. She said ok. So we went to our apartment and as we were walking upstairs the girl kept hugging me so I pushed her away because my girlfriend was their [sic]. When we got into the apartment we made coffee and gave some to the girl and she said thanks and thanks for taking me home. So we said we would take her home the next morning. So Eileen gave her some PJs and we all went to bed and the girl kept hugging on me so I thought she wanted me but my girlfriend was there. So we went to sleep and the girl woke me up by hugging me so we were for playing [sic] under the blankets, so we went into the living room so we wouldn't wake Eileen up. We were still for playing [sic] in the living room and I was kissing her and she took of [sic] my shirt and I pushed her shirt up and started kissing her bress [sic] and she started filling [sic] on my penis and I was filling [sic] on her vagina. She started [sic] pulling her pants down and I was rubbing her vagina and then I pulled my pants down and she got on top of me while I was sitting on the sofa. We had sex for about five minutes, then she pulled me to the floor, and we had sex there, for about 10 more minutes. After we were done, I was getting up, and she pushed my head down, towards her vagina, and I started to give her oral sex, for about one to two minutes. After that, we both put our PJs on, and went back to bed. Eileen was still sleeping and me and the girl cuddled a little and fell asleep. The next morning we woke up around 8:30 am and she said thanks for taking care of her * * *." *Page 4 
 {¶ 7} Additionally, when asked whether appellant thought J.P. seemed intoxicated, he said, "Yes, she was hugging me and she didn't know me and she said she loved me." When asked if anyone else said J.P. was intoxicated, appellant replied, "Yes, the bartender and the bouncer." Finally, the following question and answer are found in appellant's written statement: "Q: Before you left your bedroom with this girl what did you say to her?" A: "After we were fondling each other I said do you want to go in the living room and she said yes."
 {¶ 8} On April 22, 2005, appellant was indicted for two counts of rape in violation of R.C. 2907.02(A)(1)(c) and one count of kidnapping with a sexual motivation in violation of R.C. 2905.01(A)(2) and (4) and2941.147. On March 27, 2006, a jury found appellant guilty of one count of rape and one count of kidnapping. On June 5, 2006, the court labeled appellant a sexually oriented offender, sentenced him to four years in prison, and ordered appellant to pay restitution and a fine.
 II {¶ 9} Appellant assigns six errors for our review. However, sua sponte, we first address the sufficiency of the evidence presented to convict appellant of kidnapping. When reviewing sufficiency of the evidence, an appellate court must determine "[w]hether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the *Page 5 
crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259. Appellant was convicted of violating R.C. 2905.01(A)(2) and (4), which defines kidnapping as "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, * * * [t]o facilitate the commission of any felony * * *; [or] [t]o engage in sexual activity * * * with the victim against the victim's will * * *."
 {¶ 10} In the instant case, no evidence was presented showing force, threat, deception, or the restraint of liberty. Pursuant to R.C.2901.01(A)(1), "`Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." Appellant's statement maintained that the ride home, as well as the sex, was consensual. No evidence contradicts, or even questions, this. J.P. testified that she did not remember anything from midnight until 8:00 a.m. the next morning. Various people testified that J.P. was intoxicated, as will be analyzed later in this opinion, but nobody testified that she went with appellant against her will, or that appellant restrained her in any way. Accordingly, we hold that there was insufficient evidence to convict appellant of kidnapping. See Statev. Nieland, Greene App. No. 2005-CA-15, 2006-Ohio-784 (holding that there was no evidence that the victim was restrained in any way, therefore, there was insufficient evidence to support a kidnapping conviction). *Page 6 
 {¶ 11} We now turn to appellant's fourth assignment of error, in which he argues that he was "denied due process of law when the court overruled his motion for judgment of acquittal." Specifically, appellant argues that there was insufficient evidence to convict him of rape.
 {¶ 12} When reviewing sufficiency of the evidence, an appellate court must determine "[w]hether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259. Appellant was convicted of violating R.C. 2907.02(A)(1)(c), which defines rape as "[n]o person shall engage in sexual conduct with another * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired * * *."
 {¶ 13} Before we analyze the sufficiency of the evidence against appellant, a brief discussion of a "substantially impaired" rape victim is required. In State v. Zeh (1987), 31 Ohio St.3d 99, 103, the Ohio Supreme Court held that because the phrase "substantially impaired" is not defined in the Ohio Criminal Code, it "must be given the meaning generally understood in common usage." The Zeh court also held that it is sufficient for the state to establish substantial impairment by offering evidence at trial establishing a reduction or decrease in the victim's ability to act or *Page 7 
think. Id. at 103-04. Additionally, in In re King, Cuyahoga App. Nos. 79830 and 79755, 2002-Ohio-2313, we followed the Twelfth District Court of Appeals of Ohio's holding in State v. Martin (Aug. 12, 2000), Brown App. No. CA99-09-026:
 "[V]oluntary intoxication is included in the term `mental or physical condition' as used in R.C. 2907.02(A)(1)(c). A person who engages in * * * sexual conduct * * * when the victim's ability to resist or consent is substantially impaired by reason of voluntary intoxication is culpable for rape. * * * A person's conduct becomes criminal under this section only when engaging in sexual conduct with an intoxicated victim when the individual knows or has reasonable cause to believe that the victim's ability to resist or consent is substantially impaired because of voluntary intoxication."
(Emphasis in original.)
 {¶ 14} Furthermore, R.C. 2901.22(B) defines "knowledge" as follows: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 15} In King, supra, the victim was a minor who was served a substantial amount of alcohol by the defendant. See, also, State v.Jones, Summit App. No. 22701, 2006-Ohio-2278; State v. Martin (Aug. 14, 2000), Brown App. No. CA99-09-026. The Martin court noted the following regarding intoxication and substantial impairment:
 "We agree with appellant that the Committee Comment to R.C. 2907.02 evinces a legislative intent to exclude the situation where a person `plies *Page 8 his intended partner with drinks or drugs in the hope that lowered inhibitions might lead to a liaison.' However, the statute plainly intends to hold a person culpable for rape when that individual engages in sexual conduct with someone the individual knows or has reason to know is substantially impaired because of a mental or physical condition. While R.C. 2907.02 was not intended to criminalize sexual conduct as the result of an alcohol-induced state of `lowered inhibitions,' we cannot say that it was not intended to criminalize conduct where the victim is `substantially impaired' because of intoxication. Interpreting the statute in such a way would produce a profoundly absurd result."
 {¶ 16} We recently reviewed substantial impairment via voluntary intoxication as related to sexual battery, a lesser included offense of rape. Similar to the case at hand, in State v. Schmidt, Cuyahoga App. No. 88772, 2007-Ohio-4439, two adult strangers met at a downtown Cleveland bar where they consumed alcohol and later went with friends to a nearby hotel. In Schmidt, the victim recalled the journey from the bar to the hotel, including walking and talking in a "normal" fashion, and driving and parallel parking her car. In addition, she remembers consenting to various sexual acts with Schmidt while at the hotel, including digital penetration of her vagina. The victim maintained, however, that she did not consent to vaginal intercourse with the defendant. The victim testified that she lost consciousness momentarily and "at one point awoke to defendant with his penis inside of her without her consent." Id. at ¶ 28.
 {¶ 17} The Schmidt court held the following: "Assuming, without deciding, that there was sufficient evidence of substantial impairment * * *, the evidence is lacking as a matter of law on the element of defendant's knowledge of such impairment. * * * *Page 9 
There is nothing in this record that would enable a trier of fact to reasonably conclude that defendant was aware that [the victim] was substantially impaired to the point that it affected her ability to control his or her conduct." Id. at ¶¶ 43, 46.
 {¶ 18} As Schmidt demonstrates, when reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment. Every alcohol consumption does not lead to a substantial impairment. Additionally, the waters become even murkier when reviewing whether a defendant knew, or should have known, that someone was impaired rather than merely intoxicated. Of course, there are times when it would be apparent to all onlookers that an individual is substantially impaired, such as intoxication to the point of unconsciousness. On the other hand, "a person who is experiencing [an alcohol induced] blackout may walk, talk, and fully perform ordinary functions without others being able to tell that he is `blacked out.'" Westin, Peter, Egelhoff Again (1999), 36 Am.Crim.L.Rev. 1203, 1231. In addition, J.P.'s testimony describes a blackout as "where someone who drinks alcohol heavily can function and be, appear to be there, and conscious, but in reality, they would not have any memory of what they did or where they were." Furthermore, Aaron Reynolds, a classmate of J.P.'s at NEOUCOM, who was also at Club Moda on the night in question, testified that he blacked out from approximately midnight until leaving the bar between 2:00 and 2:30 a.m. While Reynolds did not remember anything from *Page 10 
that time period, he stated that his friends told him that he was dancing and having a good time. He also testified that when he saw J.P. at the bar, "she was intoxicated, but she wasn't unmanageable."
 {¶ 19} In the instant case, J.P. testified that she was intoxicated on the New Year's Eve in question. The doctor who examined J.P. the next day testified that, in his professional opinion, J.P.'s symptoms were consistent with someone who was inebriated the night before, and that when one is inebriated, his or her ability to make typical judgments is decreased. Additionally, Kristen Collins, a bartender at Club Moda who was working that night, testified as follows: between midnight and 2:30 a.m., Collins served J.P. nothing but water; J.P. was very drunk; J.P. was carrying on conversations, sitting, standing or dancing with appellant, Wiles, and Simpkins; when J.P. was sitting, she was "[slumping, like she was sitting on the bench but she was just like — kind of, like slumping, not sitting up straight. Not really aware, * * * looked very drunk." Collins also testified that she heard the group talking about appellant giving J.P. a ride home and then saw J.P., appellant, and Wiles leave the club together. Specifically, Collins testified that "I saw [J.P.], I saw her get up, and I saw her walk out the door with * * * Doss and Wiles. I saw her walk past the bar, she walked past the bar, and the last I saw of them, they were headed either for the bathrooms, or the side door." Collins added that she was unable to tell if J.P. was walking out on her own or if she was leaning on appellant and Wiles. *Page 11 
 {¶ 20} While we offer no opinion on this specific issue, we note that this testimony is sufficient to establish that J.P. may have been
substantially impaired. However, we conclude that there is insufficient evidence to find that appellant had knowledge of J.P.'s condition of substantial impairment — not just intoxication-beyond a reasonable doubt. The only evidence linking appellant to sexual conduct with J.P. is his own admission. Nowhere in appellant's written statement does he mention anything about knowing that J.P.'s ability to resist or consent was substantially impaired, as is required in R.C. 2907.02(A)(1)(c). Furthermore, the state presented no evidence in opposition to appellant's statement.
 {¶ 21} J.P.'s testimony that she does not remember anything about the incident is not evidence that she did not consent to the sexual encounter or that appellant knew that she may have been substantially impaired.
 {¶ 22} Collins' testimony, which is the most detailed evidence the state presented to show J.P. may have been substantially impaired, does not give rise to the inference that appellant knew, or should have known, about such impairment. Collins stated that after midnight she only served J.P. water, and J.P. was carrying on multiple conversations with appellant, Wiles, and Simpkins. Collins testified that she had state training as a bartender to recognize stages of intoxication, and that on a scale of one to four, J.P. was a three. Collins also testified that she had worked at *Page 12 
Club Moda for two-and-a-half years, and as a bartender at another establishment before that, giving her years of experience dealing with intoxicated people.
 {¶ 23} The only evidence in the record of events happening between 2:30 and 8:00 a.m. on New Year's Day is appellant's statement. It is unclear at exactly what time appellant and J.P. engaged in sexual intercourse; however, it is fair to say it was sometime after 3:00 a.m. There is no evidence that J.P. consumed any alcohol after midnight; therefore, hours had passed between J.P.'s last drink and the alleged rape. The only evidence about her mental condition at the time of the alleged rape is found in appellant's statement. A careful review of this statement reveals no evidence that appellant knew, or should have known, that J.P.'s "ability to resist or consent is substantially impaired because of voluntary intoxication." King, supra.
 {¶ 24} In reviewing the entire record, there is evidence that appellant used a condom during the sexual intercourse with J.P.; that he took J.P., and she voluntarily went to his house; that they gave J.P. pajamas to sleep in, then let her keep them the next day; that they gave J.P. a ride home the next day; that Wiles gave J.P. her name and phone number in appellant's presence; that appellant gave a voluntary statement to the police insisting that the encounter was consensual; and that appellant's version of the events never changed. These actions are not consistent with someone who knowingly commits a rape. *Page 13 
 {¶ 25} While we recognize that this is a sensitive issue, we must follow the statutory and case law before us. In the instant case, the state had the burden to prove that the rape victim was substantially impaired and that the defendant knew or should have known of the substantial impairment. We conclude that the state failed to meet this burden. The evidence shows that appellant had consensual sex with a woman who had been drinking alcohol, albeit while his girlfriend was in the other room. Appellant gave a detailed description of J.P.'s consensual conversation with him, and J.P. not only being aware, but being in control, of her actions. From all accounts, and as strange as this "good Samaritan" scenario may seem, J.P.'s decision to go home and sleep with appellant was just as voluntary as her intoxication on New Year's Eve.
 {¶ 26} Accordingly, appellant's remaining assignments of error are moot; his kidnapping and rape convictions, as well as his sexually oriented offender classification, are ordered vacated, and appellant is ordered discharged from prison.
Judgment vacated.
It is ordered that appellant recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing said court to carry this judgment into execution. *Page 14 
certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. McMONAGLE, J., CONCURS; JAMES J. SWEENEY, A.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE OPINION