The STATE of Ohio, Appellee,

v.

HATTEN, Appellant.

[Cite as State v. Hatten, 186 Ohio App.3d 286, 2010-Ohio-499.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 2009 CA 15.

Decided Feb. 12, 2010.

</div>

288

Nick A. Selvaggio and Joyce Anderson, for appellee.

Ian N. Friedman and Eric C. Nemecek, for appellant.

———————

FROELICH, Judge.

{¶ 1} Defendant-appellant Justin Hatten appeals from his conviction and sentence for kidnapping and rape. For the following reasons, we will affirm the judgment of the trial court in part and reverse it in part.

I

{¶ 2} Late on the evening of July 3, 2008, A.R. consumed two shots of tequila and one beer before going to a local bar with her roommate, K.R. At the bar, A.R. drank half a pitcher of beer and four more shots of alcohol. Coincidentally, the women's neighbor, Hatten, and two of his friends, C.M. and R.H., were drinking at the same bar. The women thought that they recognized their neighbor, but there is no evidence that Hatten saw the women there.

{¶ 3} The young women returned to their home at about 1:30 a.m. They got something to eat and began watching a movie. About 90 minutes later, C.M. knocked on their door, intending to invite the women to Hatten's home. Changing his mind, he merely asked where Hatten lived. A.R. directed him next door and returned to watching the movie. Minutes later, Hatten came to A.R.'s door to apologize for any inconvenience, and he invited the women to his home to play a video game and have a few drinks. A.R. and K.R. agreed, and they took a case of beer with them to Hatten's home.

{¶ 4} A.R. and K.R. introduced themselves to Hatten, C.M., and R.H. The women soon returned to their home for tequila, vodka, and lemons, which they brought back to Hatten's home. They consumed a shot of alcohol and began playing a video game, during which time A.R. drank another beer. After playing for a while, the women decided to leave. They went to a local store for ice cream before returning home to finish watching the movie that they had started earlier.

{¶ 5} At about 4:00 a.m., Hatten knocked on the door and asked A.R. whether she would like to come back to his home to watch a movie. She agreed. While A.R., Hatten, C.M., and R.H. were watching the movie, A.R. drank another beer. At some point, A.R. decided to leave, so she started walking toward the door. Hatten followed her, and he blocked the door with his arm. He told A.R. that he was lonely and just wanted her to stay and "cuddle" with him. She testified that she reluctantly agreed.

{¶ 6} The two talked and watched the movie. According to A.R., Hatten suddenly stood up, grabbed her arm, and pulled her down the hall to his bedroom. The bedroom door remained open as A.R. and Hatten lay on the bed to "cuddle." A.R. testified that Hatten then rolled on top of her, straddling her hips, so that she could not get away from him. While in that position, Hatten removed her pants and panties, placed a condom on his penis, and had sexual intercourse with her without her consent. A.R. never yelled for help from either C.M. or R.H. Immediately afterwards, A.R. fled to her own home, leaving her clothes behind.

{¶ 7} At approximately 6:15 a.m., K.R. awoke to the sound of A.R. crying. After hearing what had happened, K.R. contacted her mother, T.R., and they convinced A.R. to go to the hospital. Nurse Jennifer Lutz saw A.R. shortly after 7:00 a.m. She described A.R. as crying steadily, sobbing, and inconsolable. Because A.R. was going to transfer to another hospital to be seen by a Sexual Assault Nurse Examiner ("SANE nurse"), Lutz's exam was very brief. A.R. told Lutz that she had not been drinking. An emergency-room doctor briefly examined A.R., and finding her very upset and difficult to communicate with, he prescribed one milligram of Ativan, in order to help her calm down.

{¶ 8} The record does not reflect how A.R. got to the second hospital, but at approximately 9:30 a.m., A.R. was seen by SANE nurse Karen Sneed. A.R. admitted to having consumed three beers and two shots, but Sneed believed that A.R. appeared to be sober enough to consent to medical treatment. A.R. remained very tearful and sobbing. Sneed observed evidence of blunt-force trauma to A.R.'s vaginal area, which was consistent with the recent occurrence of sexual contact.

{¶ 9} Urbana Police Officer Molton briefly spoke with A.R. at the first hospital before proceeding to Hatten's home with Lieutenant Lingrell, arriving between 8:00 and 9:00 a.m. Officer Molton questioned Hatten at his front door. Unbeknownst to Hatten, the conversation was recorded. Hatten agreed with A.R.'s version of events up until the point at which she claimed that he would not let her leave, though he did admit that what she said was "more or less" true.

{¶ 10} Hatten repeatedly admitted that he and A.R. had "fooled around" and "messed around," but he consistently insisted that things only "went as far as she wanted [them] to go" and that he "did not do anything wrong." He refused to explain what he meant when he said that they "fooled around" and "messed around," and he claimed that he could not remember whether they had engaged in sexual intercourse. Hatten refused to allow the officers to search his home. Because he would not allow any officers to wait in his home while a search warrant was secured, Hatten was detained in the rear of a cruiser. Upon searching Hatten's home after the warrant was obtained, Officer Molton found

A.R.'s pants and panties on the floor in Hatten's bedroom, near an empty condom wrapper.

{¶ 11} Hatten was indicted on two counts of rape (substantially impaired and forcible), one count each of sexual battery and abduction, and one count of kidnapping with a sexual-motivation specification. He filed a motion to suppress, which the trial court overruled, and the case proceeded to trial.

{¶ 12} Hatten called two witnesses in his defense, C.M. and R.H. C.M. and R.H. described A.R. as being sexually aggressive toward Hatten. They saw her straddling Hatten's lap on the couch, kissing him. At no time did either man overhear any conversation or see any conduct that made them believe that Hatten prevented A.R. from leaving or that she remained in Hatten's home against her will. R.H. testified that he saw A.R. and Hatten walking to the bedroom, holding hands, not long before he and C.M. left.

{¶ 13} At the close of its case, the state dismissed the specification to the kidnapping charge. The jury found Hatten guilty of kidnapping and rape of a substantially impaired victim, but he was acquitted of the three other charges (sexual battery, abduction, and forcible rape). The trial court ordered two concurrent four-year sentences. Hatten appeals.

## II

### Hatten's First Assignment of Error

{¶ 14} "The state of Ohio failed to introduce sufficient evidence to sustain a conviction in violation of appellant's right to due process of law as guaranteed by Article I, Section 10 of the Ohio Constitution and [the] Fourteenth Amendment to the United States Constitution."

### Hatten's Second Assignment of Error:

{¶ 15} "Appellant's convictions were against the manifest weight of the evidence in violation of the Ohio and United States Constitutions."

{¶ 16} In his first and second assignments of error, Hatten maintains that his convictions are not supported by sufficient evidence and that they are against the manifest weight of the evidence. He also contends that his convictions were allied offenses of similar import that should have been merged.

{¶ 17} Sufficiency and manifest-weight challenges are separate and legally distinct determinations. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. "While the test for sufficiency requires a determination of whether the state has met its burden of production at trial, a manifest weight

challenge questions whether the state has met its burden of persuasion." *State v. Adelman* (Dec. 9, 1998), 9th Dist. No. 18824, 1998 WL 852565, *7.

{¶ 18} A sufficiency-of-the-evidence argument challenges whether the state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Under a sufficiency analysis, an appellate court does not make any determinations regarding the credibility of witnesses. *State v. Goff* (1998), 82 Ohio St.3d 123, 139, 694 N.E.2d 916, citing *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 19} In contrast, when reviewing a judgment under a manifest-weight standard of review, " '[t]he court reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.' " *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717.

### Rape (substantially impaired)

{¶ 20} Hatten was convicted of rape under R.C. 2907.02(A)(1)(c), which states: "No person shall engage in sexual conduct with another * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition * * * and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired * * *." Hatten does not deny that sexual conduct occurred. Instead, he argues that the state failed to offer sufficient evidence either that A.R. was substantially impaired or that he knew, or had reasonable cause to believe, that she was substantially impaired.

{¶ 21} "The Ohio Supreme Court has held that 'substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. This is distinguishable from a general deficit in ability to cope, which condition might be inferred from or evidenced by a general intelligence or I.Q. report.'" *State v. Dorsey*, Licking App. No. 2007–CA–091, 2008-Ohio-2515, 2008 WL 2571851, ¶ 43, quoting *State v. Zeh* (1987), 31 Ohio St.3d 99, 104, 31 OBR 263, 509 N.E.2d 414. "'Substantial impairment' need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." Id. Furthermore, voluntary intoxication is a "mental or physical condition" that could cause substantial impairment under R.C. 2907.02(A)(1)(c). *State v. Harmath*, Seneca App. No. 13–06–20, 2007-Ohio-2993, 2007 WL 1731572, ¶ 14. See also *State v. Martin* (Aug. 14, 2000), Brown App. No. CA99–09–026, 2000 WL 1145465; *In re King*, Cuyahoga App. Nos. 79830 and 79755, 2002-Ohio-2313, 2002 WL 982418; *State v. Jones*, Summit App. No. 22701, 2006-Ohio-2278, 2006 WL 1236840.

{¶ 22} Over the course of the evening and early morning, A.R. drank half a pitcher of beer, three cans of beer, and seven shots of alcohol. This is a tremendous amount of alcohol for anyone to consume, particularly A.R., who is a small woman, five feet tall and weighing 120 pounds. Her consumption of such a large amount of alcohol over the course of just a few hours is sufficient evidence to warrant allowing a jury to consider whether A.R. was substantially impaired.

{¶ 23} The more difficult question, however, is whether Hatten knew, or had reasonable cause to believe, that A.R. was substantially impaired. "[W]hen reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment. Every alcohol consumption does not lead to a substantial impairment. Additionally, the waters become even murkier when reviewing whether the defendant knew, or should have known, that someone was impaired rather than merely intoxicated." *State v. Doss*, Cuyahoga App. No. 88443, 2008-Ohio-449, 2008 WL 323168, ¶ 18.

{¶ 24} Most of the alcohol that A.R. drank was consumed before she went to Hatten's home. While with Hatten, A.R. drank two beers and a shot of tequila. There was no evidence that Hatten knew of A.R.'s actions, and in particular any alcohol consumption, prior to coming to his home. Moreover, the state offered no evidence of any particular aspects of A.R.'s behavior that should have alerted Hatten to her substantial impairment, such as stumbling, falling, slurred speech, passing out, or vomiting.

{¶ 25} For example, in *Harmath*, 2007-Ohio-2993, 2007 WL 1731572, the defendant was aware that the victim had consumed a large amount of alcohol; she was described as being "drunk" and "very intoxicated." The defendant saw the victim stumbling and falling down, and he saw her vomit twice before "passing out." Based on these facts, the court of appeals concluded that the trial court did not err in denying Harmath's Crim.R. 29 motion for acquittal. See also *State v. Eberth*, Mahoning App. No. 07–MA–196, 2008-Ohio-6596, 2008 WL 5228913 (defendant's carrying unconscious victim, whom he was aware had passed out after ingesting a large amount of alcohol and cocaine, from bar is evidence that he knew, or should have known, of her substantial impairment); *State v. Williams*, Lorain App. No. 02CA008112, 2003-Ohio-4639, 2003 WL 22047765 (defendant's awareness that victim has passed out after ingesting a substantial amount of alcohol is evidence that he knew, or should have known, that the victim was substantially impaired).

{¶ 26} In contrast, in *State v. Schmidt*, Cuyahoga App. No. 88772, 2007-Ohio-4439, 2007 WL 2446862, although the defendant was aware that the victim had been drinking heavily, the victim exhibited no behavioral signs of substantial impairment. The victim described herself as "pretty drunk," but she admitted that she was walking normally and not slurring her words and that she was able to drive her car. The victim was able to give a detailed statement of the events of that night, and she admitted that much of the sexual contact was consensual. Furthermore, the defendant's friend, who was in the bathroom, heard no conflict and believed that the sexual activity was consensual. Under these facts, the appellate court concluded that "[t]here is nothing in this record that would enable a trier of fact to reasonably conclude that defendant was aware that [the victim] was substantially impaired to the point that it affected her ability to control.* * * her conduct" Id. at ¶ 46.

{¶ 27} Similarly, in *Doss*, 2008-Ohio-449, 2008 WL 323168, the victim and a bartender testified that the victim was very drunk, yet she was able to carry on conversations and dance with the defendant. The victim voluntarily left the bar with the defendant. The appellate court held that while there might have been evidence of substantial impairment, it was insufficient to prove beyond a reasonable doubt that the defendant knew, or should have known, of the victim's substantial impairment. Id. at ¶ 20.

{¶ 28} Beyond the quantity of alcohol that A.R. consumed, the only evidence that the state offers in support of its claim that Hatten knew, or had reasonable cause to believe, that she was substantially impaired is his training through the Ohio Peace Officer Training Academy ("OPOTA") as a police officer, which includes "what to look for in an intoxicated person." Additionally, after being hired as a state liquor agent, he took a course entitled Advanced Detection,

Apprehension and Prosecution of Persons under the Influence of Alcohol ("ADAP"), which "is primarily directed toward drunk driving." The course description reads as follows:

{¶ 29} "This five-day course is designed to enhance the skills required to detect, apprehend and prosecute persons operating a motor vehicle while under the influence of alcohol and/or drugs. The course includes classroom instruction and controlled exercises structured to give the officer practical experience in evaluation of the adverse effects of alcohol/drugs on driving ability. In these exercises the student is required to observe persons who have consumed controlled quantities of alcohol. Each exercise allows the students to use the most up-to-date sobriety testing to evaluate the condition of the drinker.

{¶ 30} "Classroom subjects include a detailed study of the elements of Ohio's DUI law, the drunk driver problem, enforcement decisions, chemical testing rules and regulations, arrest procedures, operating a video camera in the patrol car to apprehend and prosecute impaired drivers and courtroom testimony.

{¶ 31} "Students are trained and certified in both the theory and practice of standardized improved sobriety test battery, consisting of the horizontal gaze nystagmus test, walk-and-turn test, and one-leg stand test as developed and recommended by the National Highway Traffic Safety Administration."

{¶ 32} The state offered no details of what specific behavior or characteristics Hatten is trained to look for in drunk drivers or that A.R. exhibited any such behaviors or characteristics. A.R. was not driving that night, and Hatten had no reason to perform any field-sobriety tests on her. Moreover, there is no evidence that Hatten had any specialized training regarding "substantial impairment," as opposed to operating a motor vehicle under the influence of alcohol and/or drugs. We are not prepared to hold that training such as Hatten's automatically enables an officer to recognize every person who is intoxicated, let alone one who is substantially impaired. The proof must be of reasonable cause to believe the victim is substantially impaired—not just intoxicated or "under the influence"— beyond a reasonable doubt. See, e.g., *Doss*, 2008-Ohio-449, 2008 WL 323168, at ¶ 20.

{¶ 33} Furthermore, A.R.'s own testimony fails to support the state's argument that Hatten knew, or had reasonable cause to know, of her substantial impairment. A.R. testified that when she got home from the bar, she "was buzzed, but [she] was not drunk." She further described herself as only "half drunk." Before A.R. went to Hatten's home, approximately 90 minutes passed, during which she consumed no more alcohol. A.R. was asked, "During the time that you were [in Hatten's home] did you have any problem at all understanding what was going on around you?" To this question, she responded, "[N]o." A.R. further denied that she had any trouble understanding what she was doing and admitted

that she was able to carry on a conversation with Hatten. None of the testimony of either A.R.'s friends or Hatten's friends contradicts A.R.'s characterization of herself as both understanding and being in control of her actions.

{¶ 34} We also note that neither the medical personnel nor the investigating officers recognized signs of intoxication in A.R. when they spoke with her, let alone signs of substantial impairment. In fact, the emergency-room doctor prescribed Ativan to calm A.R., although both nurses testified that the drug is contraindicated for individuals who have been drinking alcohol. Later that morning, the SANE nurse believed that A.R. was capable of consenting to treatment. To be sure, these contacts took place anywhere from one to four hours after the incident; any signs of intoxication and/or substantial impairment might have passed by that time, or they might have been masked by A.R.'s being so upset. However, these factors do weigh against the state's claim that Hatten knew, or had reasonable cause to know, of A.R.'s substantial impairment.

{¶ 35} To some extent, the state also relies on evidence of A.R.'s behavior of running from Hatten's home, unclothed, as evidence of her substantial impairment. While we do not question for an instant that A.R. was extremely distraught, because this behavior occurred after the sexual conduct, it cannot be a substantial factor as to whether Hatten knew, or had reasonable cause to believe, that A.R. was substantially impaired prior to the conduct.

{¶ 36} The question is not whether the victim was intoxicated but whether she was "substantially impaired," as that term is defined by law, and whether the defendant had reasonable cause to believe that she was "substantially impaired." The only evidence that the state introduced regarding Hatten's knowledge in this regard was his training with OPOTA and ADAP and that he was aware that A.R. had consumed two beers and a shot of tequila while in his home.

{¶ 37} Given the lack of evidence of any specific behavior by A.R. that might indicate her substantial impairment, we conclude that any evidence concerning Hatten's training alone is insufficient evidence that he knew, or had reasonable cause to believe, that A.R. was substantially impaired, in order to warrant submitting the rape charge to the jury. The state having offered insufficient evidence of one element of the charge, Hatten's rape conviction must be vacated.

### Kidnapping

{¶ 38} Hatten was also found guilty of kidnapping pursuant to R.C. 2905.01(A)(4), which states: "No person, by force, threat, or deception * * * shall remove another [person] from the place where the other person is found or restrain the liberty of the other person, [in order to] engage in sexual activity * * * with the victim against the victims will." Hatten argues that there is

insufficient evidence of force to support his kidnapping conviction and that the conviction is against the weight of the evidence.

{¶ 39} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Although "deception" is not defined in Chapter 2905, it is defined in Chapter 2913 (Theft and Fraud). " 'Deception' means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A). As this definition conforms to the generally accepted meaning of the word "deception," it has been applied in the context of Chapter 2905. See, e.g., *State v. Young* (July 28, 1992), Meigs App. No. 458, 1992 WL 188485.

{¶ 40} The state first argues that Hatten used both force and deception when he blocked the door and coerced A.R. to stay and "cuddle." A.R. testified that when she walked to the door to leave Hatten's home, he "followed me to the door and when I got to the door he put his arm across the doorway so I could not get out and told me just to stay and we would cuddle. That's all he wanted to do was cuddle." Hatten admitted to the police that this is "more or less" what happened.

{¶ 41} A.R. claimed that she did not persist in trying to leave because Hatten is significantly larger than she, and she believed that he would continue to block the door and refuse to let her leave. She then explained that she decided to stay because "I thought if he had been drinking that he would be ready to pass out soon and if I just laid with him for a little while he would eventually pass out and I would be able to leave." Particularly in light of A.R.'s explanation, we conclude that this is insufficient evidence of deception on the part of Hatten. However, this evidence is sufficient to prove that Hatten restrained A.R.'s liberty by force. See, e.g., *State v. Wade*, Franklin App. No. 06AP–644, 2008-Ohio-1797, 2008 WL 1723671 (defendant blocked doorway, refusing to let his much smaller victim leave).

{¶ 42} Alternatively, the state insists that the kidnapping charge could be based upon Hatten's using force to pull A.R. down the hall by her arm. Pulling a victim down a hallway is sufficient evidence of forcible removal of the victim to support a kidnapping conviction. See, e.g., *State v. Garcia* (Feb. 7, 2002), Cuyahoga App. No. 79281, 2002 WL 192087. A.R. testified that Hatten pulled her, by the arm, down the hallway from the living room to the bedroom. Thus, the evidence is sufficient to warrant putting the charge before the jury.

Hatten argues that A.R.'s testimony that she was pulled down the hall was not believable. However, the credibility of witnesses and the weight to be given to their testimony are matters for the trier of fact to resolve. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212.

{¶ 43} Based on the record before us, we conclude that there was sufficient evidence to warrant submitting the kidnapping charge to the jury. Moreover, we do not conclude that the jury's conviction on that charge indicates that the jury clearly lost its way or that there was a manifest miscarriage of justice. Consequently, we will not disturb the jury's verdict on the kidnapping conviction.

### Allied Offenses

{¶ 44} Finally, Hatten argues that the rape and kidnapping convictions should have been merged as allied offenses of similar import. Although, having vacated his rape conviction, we need not address this argument, we do point out that we have previously held that rape under R.C. 2907.02(A)(1)(c) and kidnapping under R.C. 2905.01(A)(4) are not allied offenses of similar import. *State v. Ginyard* (Oct. 8, 1999), Montgomery App. No. 17344, 1999 WL 818049.

{¶ 45} For the foregoing reasons, Hatten's first assignment of error is sustained in part and overruled in part. His second assignment of error is overruled.

### III

### Hatten's Third Assignment of Error

{¶ 46} "The trial court abused its discretion when it overruled appellant's motion to suppress."

{¶ 47} In his third assignment of error, Hatten argues that the trial court erred in refusing to suppress incriminating statements that he made to police while in custody, without the benefit of Miranda warnings. He also claims that during the interrogation, he invoked his right to counsel and that any statements made after that point should have been suppressed. We disagree.

{¶ 48} "[I]n reviewing decisions on motions to suppress, an appellate court reviews the record to see if substantial evidence exists to support the trial court's ruling, bearing in mind that the trial court has the function of assessing credibility and weighing evidence. See, e.g., *State v. Brown* (1993), 91 Ohio App.3d 427, 429–430, 632 N.E.2d 970, * * *. However, in the particular area of custodial interrogations, the United States Supreme Court has said that whether a suspect is in custody is a mixed question of fact and law entitled to independent review. *State v. Smith* (June 3, 1997), Franklin App. No. 96AP10–1281, * * *, citing *Thompson v. Keohane* (1995), 516 U.S. 99, 116 S.Ct. 457, 460, 133 L.Ed.2d

383. See also, *State v. Evins* (Feb. 28, 1997), Montgomery App. No. 15827, [1997 WL 82803]." *State v. Estepp* (Nov. 26, 1997), Montgomery App. No. 16279, 1997 WL 736501, *2.

{¶ 49} Police are not required to give warnings pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, to every person they question, even if the person being questioned is a suspect. *State v. Biros* (1997), 78 Ohio St.3d 426, 440, 678 N.E.2d 891. Instead, Miranda warnings are required only for custodial interrogations. Id. "The determination of whether a custodial interrogation has occurred requires an inquiry into 'how a reasonable man in the suspect's position would have understood his situation.' [*Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317.] ' "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest." ' " *Estepp,* 1997 WL 736501, *4, quoting *Biros,* 78 Ohio St.3d at 440, 678 N.E.2d 891, in turn quoting *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275.

{¶ 50} In reaching this determination, neither the subjective intent of the officer, nor the subjective belief of the defendant is relevant. *Estepp,* 1997 WL 736501, *4, citing *State v. Hopfer* (1996), 112 Ohio App.3d 521, 546, 679 N.E.2d 321, discretionary appeal not allowed, 77 Ohio St.3d 1488, 673 N.E.2d 146. Instead, we have considered factors such as the location of the interview and the defendant's reason for being there, whether the defendant was a suspect, whether the defendant was handcuffed or told he was under arrest or whether his freedom to leave was restricted in any other way, whether there were threats or intimidation, whether the police verbally dominated the interrogation or tricked or coerced the confession, and the presence of neutral parties. *Estepp* at *4.

{¶ 51} Hatten agreed to talk to the officers, although he could have chosen to refuse. The interview took place in a location from which an individual would normally feel free to leave, because Hatten chose to speak with the officers outside his own front door. " 'This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements, and diminishes the * * * [defendant's] fear that if he does not cooperate, he will be subjected to abuse.' " *Estepp* at *5, quoting *State v. Bowshier* (Oct. 16, 1992), Clark App. No. 2898, 1992 WL 288780, *4, in turn citing *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317.

{¶ 52} There is no evidence that anyone prevented Hatten from leaving or just closing the door at any time before the incriminating statements were made. He was neither handcuffed nor physically restrained at any point during the interview. Moreover, there is no evidence that Hatten was physically or verbally

intimidated or threatened, or that he was tricked or coerced into making any incriminating statements.

{¶ 53} At the end of the interview, it is true that Hatten was not permitted to re-enter his home, and he was placed in a police cruiser. However, the officers explained to him that he was not under arrest but that because he was not consenting to a search of his home, and he would not allow an officer to wait inside his home, it was necessary to take him into investigative custody in order to preserve any evidence until a search warrant was obtained. No statements were made by Hatten during the wait.

{¶ 54} The trial court found that the officers did not verbally dominate the interview. Even if they had, however, the *Estepp* court found this to be a relatively insignificant factor, because the police, as the investigators, "would naturally have taken the lead in questioning." *Estepp*, 1997 WL 736501, *6. In fact, the only factors weighing in Hatten's favor are that he was a suspect and that no neutral parties were present during the interview.

{¶ 55} When considered objectively, a reasonable person in Hatten's position would not have believed, under all of the circumstances, that he was under arrest or its functional equivalent. See, e.g., *State v. Petitjean* (2000), 140 Ohio App.3d 517, 523, 748 N.E.2d 133, citing *Stansbury v. California* (1994), 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293. Hatten failed to meet his burden of proving that he was subjected to a custodial interrogation. See, e.g., *State v. Muncy*, Montgomery App. No. 21563, 2007-Ohio-1675, 2007 WL 1057007, ¶ 8, fn. 1. Therefore, Miranda warnings were not necessary, and the statements were admissible.

{¶ 56} Hatten also argues that while on his porch, he invoked his right to counsel by stating, "I'm gonna talk to a lawyer." He further insists that even if this invocation were equivocal, the officers had a duty to ask questions in order to clarify his intent. He concludes that any statements he made after this invocation must be suppressed.

{¶ 57} The question of "[w]hether a suspect has invoked his right to counsel is an objective inquiry [*Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378; *Davis v. United States* (1994), 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362]. A request for an attorney must be clear and unambiguous such that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to counsel. *Davis*, 512 U.S. at 459[, 114 S.Ct. 2350, 129 L.Ed.2d 362]; see *State v. Murphy* [2000], 91 Ohio St.3d 516, 520, 747 N.E.2d 765." *State v. Baker*, Champaign App. No. 2004 CA 19, 2005-Ohio-46, 2005 WL 37868, ¶ 33. Moreover, when a suspect's mention of counsel does not amount to an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him. Id. at ¶ 34, citing *Davis* at

461–462, 114 S.Ct. 2350, 129 L.Ed.2d 362; *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 18. And, contrary to Hatten's assertion, "officers have no obligation to ask clarifying questions to ascertain if the suspect is attempting to invoke his right to counsel." Id., citing *Davis*.

{¶ 58} Neither Officer Molton nor Lieutenant Lingrell heard Hatten invoke his right to counsel during the initial interview. They testified that after Hatten was taken to the police station, he was advised of his rights, that he did invoke his right to counsel at that time, and that there was no further questioning by the officers or statements by Hatten. Furthermore, Hatten's statement must be considered in its proper context. We have listened to the recorded interview. Hatten's entire statement was, "Listen, I respect what you're doing and everything. I'm not trying to get into any kind of trouble * * * and if you're trying, you know, to get me in trouble, I'm gonna talk to a lawyer. No offense." Finding this to be at best an expression of a conditional, future intent to talk to a lawyer, the trial court held that there had been no unequivocal invocation of the right to counsel. We agree.

{¶ 59} Because the trial courts findings that Hatten was not in custody and that he did not invoke his right to counsel were supported by competent, credible evidence, we will overrule Hatten's third assignment of error.

IV

Hatten's Fourth Assignment of Error

{¶ 60} "The trial court abused its discretion by precluding defense counsel from cross-examining Ms. [A.R.] concerning her prior conviction for inducing panic and her testimony at the preliminary hearing concerning the same."

{¶ 61} As a preliminary matter, Hatten has filed a motion to supplement the appellate record with several documents related to A.R.'s misdemeanor conviction for inducing panic. Those documents include the police officer's statement, A.R.'s waiver of jury trial and counsel, her no-contest plea, a summons, the trial court's judgment entry, and a letter written to the court by A.R. Our examination of the record shows that these documents were before the trial-court judge, as they were attached to the state's second motion in limine. Therefore, the documents are already part of the appellate record and will be considered. Accordingly, Hatten's motion is overruled.

{¶ 62} In his final assignment of error, Hatten maintains that he should have been allowed to fully cross-examine A.R. concerning her misdemeanor conviction for inducing panic, including the underlying facts, the suicide counseling ordered as a result of her conviction, and her prior testimony concerning the underlying facts that she gave at the preliminary hearing for the instant case. In essence,

Hatten's argument is that if a court ordered A.R. to participate in suicide counseling, she must have attempted suicide, and because she denied attempting suicide during her preliminary-hearing testimony, she should be able to be impeached based on this prior inconsistent statement.

{¶ 63} The scope of permissible cross-examination is within the sound discretion of the trial court. *State v. Amburgey* (1987), 33 Ohio St.3d 115, 515 N.E.2d 925. Therefore, a reviewing court will not override such a decision absent an abuse of discretion. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 129–130. An abuse of discretion means that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 16 O.O.3d 169, 404 N.E.2d 144. Because we do not believe that A.R.'s misdemeanor conviction was relevant in the instant case, we conclude that the trial court did not abuse its discretion in refusing to allow more extensive questioning of A.R. regarding that conviction.

{¶ 64} Prior to the start of A.R.'s testimony, the trial court considered the admissibility of evidence of her misdemeanor inducing-panic conviction. At that time, Hatten argued that "the bottom line is that at the preliminary hearing Miss [A.R.] testified that she did not attempt suicide. The court records * * * leaves us with the fact that the judge in the Municipal Court found it was a suicide attempt * * *" and ordered suicide counseling. Hatten sought to use A.R.'s conviction as evidence of her "dishonesty at the preliminary hearing * * *." He argued, "This woman is a liar. I have the court records to prove it, and I think I am entitled to do so." The trial court ruled that "[t]he questioning can be about what took place in the preliminary hearing in this case, not about the separate inducing panic situation." The court also allowed that A.R. could be asked if she was ordered to attend suicide counseling.

{¶ 65} During a break in the middle of A.R.'s testimony, the issue was addressed again. The trial court clarified that Hatten was "allowed to ask if she was ever ordered to attend suicide counseling, and I'm sure there will be questions which he's allowed to ask about whether she ever said she attempted to commit suicide. I don't know what conversation she had with the Defendant and any conversations with the Defendant have not been addressed in previous requests from Counsel or in orders of the Court."

{¶ 66} In accordance with the trial court's ruling, the following questioning occurred during defense counsel's cross-examination of A.R.:

{¶ 67} "Q. While you were sitting on the couch with Justin did you have a discussion with him about suicide?

{¶ 68} "A. We discussed a scar on my arm, but it was not about suicide.

{¶ 69} "Q.  You got the scar on your arm by cutting your arm with a razor blade;  did you not?

{¶ 70} "A.  I did.

{¶ 71} "Q.  And where exactly is that scar on your arm?

{¶ 72} "A.  On my left wrist.

{¶ 73} "Q.  Subsequent to that cut were you at any time ordered to go to suicide counseling or to take a suicide seminar or course?

{¶ 74} " * * *

{¶ 75} "A.  I was ordered to go to counseling for a year.

{¶ 76} "Q.  Did you go?

{¶ 77} "A.  Yes, I did.

{¶ 78} "Q.  And counseling was suicide counseling?

{¶ 79} "A.  It was grief counseling."

{¶ 80} Prior to K.R.'s testimony, A.R.'s conviction was addressed by the trial court for the third time.  At this point, counsel argued for the first time that he should also be permitted to go into unspecified municipal-court records regarding A.R.'s supposed history of alcoholism and drunk driving and her alleged failure to abide by court orders, as evidenced by driving under a suspended license.  The trial court found that the evidence was not relevant and that it was "not a matter of which the character or testimony of the witness can be impeached."  Although Hatten does mention A.R.'s unspecified history of alcoholism on appeal, he never attempted to ask any questions of A.R. regarding this supposed history.  He has, therefore, waived his right to present this portion of his argument on appeal. *State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 81} Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Evid.R. 401.  Relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  Evid.R. 402 and 403(A).

{¶ 82} We conclude that evidence related to A.R.'s inducing-panic conviction is irrelevant to the charges against Hatten.  Nevertheless, even though the scope of the evidence was more limited than he would have liked, Hatten was able to inform the jury that (1) A.R. had intentionally cut her wrist with a razor blade, (2) she was ordered to attend suicide counseling, and (3) she denied that the incident was a suicide attempt.  Therefore, Hatten was able to make the argument during his closing that A.R. was lying at trial about attempting suicide.  Additional

details regarding the facts underlying that conviction and the preliminary-hearing testimony, which was consistent with her trial testimony, would only have served to confuse the issues and/or mislead the jury. The court did not abuse its discretion.

{¶ 83} Hatten's fourth assignment of error is overruled.

V

{¶ 84} Hatten's first assignment of error having been sustained in part, and his remaining assignments of error having been overruled, the judgment of the trial court will be affirmed in part and reversed in part. Hatten's conviction for rape is hereby vacated.

{¶ 85} As part of Hatten's sentence, he was designated as a Tier III sex offender as a result of his rape conviction. However, the R.C. 2950.01 requirements et al. were not addressed in regard to Hatten's kidnapping conviction. Having vacated Hatten's rape conviction, we remand this case to the trial court.

Judgment accordingly.

BROGAN and FAIN, JJ., concur.