[Cite as *State v. Jenkins*, 2015-Ohio-5167.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2015-CA-6 |
| | : | |
| v. | : | T.C. NO. 14CR379 |
| | : | |
| K-VONNE JENKINS | : | (Criminal appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 11th day of December, 2015.

. . . . . . . . . . .

NATHANIEL R. LUKEN, Atty, Reg. No. 0087864, Assistant Prosecutor, 61 Greene Street, Xenia, Ohio 45385
      Attorney for Plaintiff-Appellee

DAVID R. MILES, Atty. Reg. No. 0013841, 125 West Main Street, Suite 201, Fairborn, Ohio 45324
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant K-Vonne T. Jenkins appeals from his conviction and

sentence on one count of Sexual Battery, in violation of R.C. 2907.03(A)(2), a felony of the third degree. Jenkins contends that his conviction is not supported by sufficient evidence, and is also against the manifest weight of the evidence. He also contends that the trial court erred in overruling his objection, under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to the State's peremptory challenge to a prospective juror.

{¶ 2} We conclude that the judgment of the trial court is supported by sufficient evidence, and is not against the manifest weight of the evidence. We also conclude that the record supports the overruling of Jenkins's *Batson* objection, because the State offered a race-neutral basis for its peremptory challenge, which the trial court accepted as non-pretextual. Accordingly, the judgment of the trial court is Affirmed.

**I. The Offense**

{¶ 3} In early March 2014, the victim, K.H., went to a party at a residence located in Xenia, Ohio. Accompanying K.H. to the party were her friends, S.L. and R.R. K.H., S.L. and R.R. were all sixteen years of age at the time of the incident. K.H. testified that she and her friends were going to the party to meet two men they had met on Facebook, John and Buddy. The three girls arrived at the party between 7:00 and 8:00 p.m. When K.H. and her friends arrived, John and Buddy were the only individuals at the residence.

{¶ 4} Approximately two hours later, six or seven more people, including Jenkins, arrived at the residence where the party was being held. K.H. testified that during this time, she smoked marijuana and had "one sip" of alcohol. K.H. also testified that she was taking a number of medications that had been prescribed for anxiety and depression,

including Trazodone, Remeron, Prozac, and Klonopin.

{¶ 5} Around this time, K.H. began having some limited interaction with Jenkins. Jenkins discussed buying some of K.H.'s prescription medications, including Vicodin and Percocet. Jenkins left the party for a short time to purchase more alcohol for K.H. and her friends. K.H. testified that Jenkins returned to the party less than one hour later with more alcohol. K.H. further testified that someone handed her a cup containing approximately one inch of clear liquid, which she assumed to be water. K.H. testified that she drank the contents of the cup.

{¶ 6} Later that night, Jenkins and some of his friends approached K.H. and attempted to persuade her to accompany them into the bathroom by telling her that John was attracted to her. The bathroom area of the house contained two rooms separated by door; a larger room with a sink and a bathtub, and a smaller room with a toilet. K.H. went into the smaller room and shut the door. K.H. testified that she could hear Jenkins and his friends speaking with John for a short time. At this point, K.H. testified that she started to feel dizzy and weak, and was unable to form her words correctly.

{¶ 7} After John left the bathroom, Jenkins opened the door to the smaller room, where K.H. was. K.H. testified that Jenkins told her that if she wanted to leave the bathroom, she had to perform oral sex on him and his friends. K.H. testified that she felt very weak, and the men pushed her down on her knees next to the bathtub. K.H. testified that her memory faded out, and she did not recall performing oral sex on any of the men. When she became conscious and aware of her surroundings again, Jenkins had pushed her into the smaller section of the bathroom and taken off her clothes. Jenkins then bent K.H. over the toilet and placed his penis in her vagina. K.H. testified that she had no

control of her body, and Jenkins had to hold her up during the entire sexual assault, which lasted about ten minutes. K.H. testified that she passed out for short time after the assault, waking up later while still within the smaller section of the bathroom.

{¶ 8} K.H. testified that her friends S.L. and R.R. helped her find her clothes and dress herself after she woke up. K.H. testified that they left the party approximately 45 minutes later and arrived at her house at about 7:00 a.m. Once K.H. got home, she slept the entire next day.

{¶ 9} S.L. testified that when she, K.H., and R.R. arrived at the party, there were just a few men smoking marijuana and drinking alcohol. The men offered the girls marijuana and alcohol. The men, including Jenkins, also offered to purchase the girls alcohol. The girls accepted their offer and gave them money. S.L. testified that the men left the party for a while, returning shortly thereafter with two bottles of vodka. S.L. testified that she, K.H., and R.R. smoked marijuana and drank vodka directly from the bottle. R.R. did not drink as much as the rest of the girls, because she was the designated driver. After finishing the first bottle, they opened the second bottle and began drinking from it. S.L. also testified that she observed people snorting Xanax pills at the party, but she did not ingest any Xanax, nor did she observe K.H. do so.

{¶ 10} S.L. testified that K.H. appeared to be heavily intoxicated. S.L. testified that K.H. was "stumbling and acting kind of crazy and just wild." Trial Tr. Vol. I, pg. 169. S.L. further testified that everyone at the party stayed in the same room together for the entire night; however, at some point, she noticed that K.H. was not in the room with her. When K.H. returned, S.L. observed her cut her foot on a piece of glass. S.L. testified that K.H. failed to register any discernible reaction upon cutting her foot. S.L. testified

that on the way home, K.H. passed out in the back seat of the car. S.L. testified that they arrived at K.H.'s house at approximately 5:30 a.m. the next morning. S.L. slept at K.H.'s house for an hour after they arrived. S.L. testified that when she woke up, she observed that K.H. had fallen asleep in a chair in the kitchen and had vomited on the floor nearby.

{¶ 11} K.H. testified that she woke up in her own bed between 7:00 and 8:00 p.m. the following night. After piecing together the events of the previous night, K.H. went downstairs and told her parents that she had been assaulted. K.H.'s mother immediately took her to the hospital, where she underwent a sexual assault exam conducted by Carolyn Palmer, a registered nurse. Palmer testified that she interviewed K.H. and conducted a physical exam. Palmer testified that she found several areas of bruising and redness on K.H.'s body, including redness, tenderness, and swelling around the vaginal area. Palmer also collected evidence during the exam, including oral, vaginal, and rectal swabs, which she dried and sealed in separate envelopes before including them in a rape kit. Palmer collected blood and urine samples from K.H. In addition, Palmer obtained the underwear K.H. had been wearing when she was assaulted.

{¶ 12} K.H. tested positive for marijuana and benzodiazepines. Additionally, K.H.'s blood was found to contain Trazodone, Xanax, Mirtazapine, Klonopin, and Prozac. Jenkins's DNA was found in K.H.'s underwear.

{¶ 13} Jenkins did not testify at trial. However, Xenia Police Department Detective Matt Miller interviewed Jenkins on April 3, 2014. Det. Miller testified that Jenkins provided an oral and a written statement regarding his actions on the night of the alleged assault. Specifically, Jenkins stated that he was only at the party at the Xenia residence for about twenty to thirty minutes before he left with a friend. Jenkins stated

that while he was at the party, he spoke to K.H. for about five minutes regarding some prescription medications that that she was taking. Jenkins denied having any other contact with K.H.

## II. The Course of Proceedings

{¶ 14} Jenkins was indicted on two counts of Sexual Battery. The first count was based on K.H.'s allegation that Jenkins forced her to have vaginal sex with him. The second count was based on K.H.'s allegation that Jenkins forced her to perform oral sex on him.

{¶ 15} Jenkins moved to suppress any statements he made to the police and any other physical evidence obtained through DNA testing. The trial court overruled the motion to suppress, following a hearing.

{¶ 16} At the jury trial, following the close of the State's evidence, Jenkins moved, under Crim.R. 29, for a judgment of acquittal on both counts of Sexual Battery. The trial court dismissed the second count pursuant to Jenkins's Crim.R. 29 motion, and the jury found Jenkins guilty of the remaining count of sexual battery. Jenkins filed a post-verdict motion for acquittal, which was overruled. The trial court ordered Jenkins to submit to an examination by the Forensic Psychiatry Center for Western Ohio as a candidate for probation and risk of sexual re-offense. The trial court also ordered the probation department to assemble a pre-sentence investigation report (PSI) for Jenkins.

{¶ 17} Jenkins was sentenced to a nine-month prison term, with jail-time credit of 221 days. The trial court also designated Jenkins as a Tier III sexual offender. Jenkins appeals.

## III. The Judgment Is Supported by the Evidence, and Is Not Against the

## Manifest Weight of the Evidence

{¶ 18} Jenkins's First, Second, and Third Assignments of Error are as follows:

APPELLANT'S CONVICTION FOR SEXUAL BATTERY IS BASED UPON INSUFFICIENT EVIDENCE.

THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR ACQUITTAL.

APPELLANT['S] CONVICTION FOR SEXUAL BATTERY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 19} In his First Assignment of Error, Jenkins contends that his conviction for sexual battery is not supported by sufficient evidence.  In his Second Assignment of Error, Jenkins argues that the trial court erred when it overruled his post-verdict Crim. R. 29(C) motion for acquittal with respect to the first count of sexual battery.  Since the standard of review is the same for both of these assignments of error, they can be addressed together.   In his Third Assignment of Error, Jenkins argues that his conviction for Sexual Battery is against the manifest weight of the evidence.   In support of all three assignments of error, Jenkins argues that the State adduced insufficient evidence to establish that K.H. was "substantially impaired," as required under R.C. 2907.03(A)(2). Jenkins also argues that the State failed to prove that he knew K.H. was substantially impaired when he engaged in the sexual activity with her.

{¶ 20} In reviewing a ruling on a Crim. R. 29(C) post-verdict motion for judgment of acquittal, we must determine whether the evidence, when viewed in a light most favorable to the State, supports the verdict. *State v. Mauro*, 2d Dist. Montgomery No. 9499, 1987 WL 14254, *1 (July 14, 1987).   "Reviewing the denial of a Crim. R. 29 motion

therefore requires an appellate court to use the same standard as is used to review a sufficiency of the evidence claim." *Id.* "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (Citations omitted). *State v. Crowley*, 2d Dist. Clark No. 2007 CA 99, 2008-Ohio-4636, ¶ 12.

{¶ 21} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Cassell*, 2d Dist. Clark No. 09CA0064, 2011-Ohio-23, ¶ 46. When a conviction is challenged on appeal as being against the manifest weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist. 1983).

{¶ 22} With the foregoing standards in mind, we conclude that Jenkin's Sexual Battery conviction is supported by legally sufficient evidence and is not against the manifest weight of the evidence. In relevant part, the Sexual Battery statute provides: "No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply: * * * The offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired." R.C. 2907.03(A)(2). "The phrase 'substantially impaired,' in that it is not

defined in the Ohio Criminal Code, must be given the meaning generally understood in common usage. * * * [S]ubstantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. This is distinguishable from a general deficit in ability to cope, which condition might be inferred from or evidenced by a general intelligence or I. Q. report." *State v. Zeh*, 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414 (1987). Although substantial impairment may be established through expert testimony, expert testimony is not required. Substantial impairment also may be established through lay testimony, *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 21 (2d Dist.) (discussing substantial impairment in a rape case and noting that it can be shown through non-expert witnesses who have interacted with the victim). Furthermore, voluntary intoxication is a "mental or physical condition" that could cause substantial impairment under R.C. 2907.02(A)(1)(c). *Id.*

{¶ 23} In *State v. Harmath*, 3d Dist. Seneca No. 13-06-20, 2007-Ohio-2993, the defendant was aware that the victim had consumed a large amount of alcohol; she was described as being "drunk" and "very intoxicated." The defendant saw the victim stumbling and falling down, and he saw her vomit twice before "passing out." Based on these facts, the court of appeals concluded that the trial court did not err in overruling Harmath's Crim. R. 29 motion for acquittal. *See also State v. Eberth*, 7th Dist. Mahoning No. 07-MA-196, 2008-Ohio-6596 (defendant's carrying unconscious victim, whom he was aware had passed out after ingesting a large amount of alcohol and cocaine, from bar is evidence that he knew, or should have known, of her substantial impairment); *State v. Williams*, 9th Dist. Lorain No. 02CA008112, 2003-Ohio-4639 (defendant's awareness that victim has

passed out after ingesting a substantial amount of alcohol is evidence that he knew, or should have known, that the victim was substantially impaired).

{¶ 24} In the case before us, K.H. testified that she only had a "sip" of alcohol and smoked a small amount of marijuana at the party. Additionally, 45 minutes before she was sexually assaulted by Jenkins, she claims that someone at the party gave her a cup containing a clear liquid, which she also ingested. On the other hand, S.L. testified she, K.H., and R.R. smoked marijuana and drank vodka directly from the bottle. After finishing the first bottle, S.L. testified that they opened the second bottle purchased by Jenkins and began drinking directly from it as well. Significantly, K.H. was taking several prescription medications, which were found in her bloodstream, including Trazodone, Mirtazapine, Klonopin, and Prozac. K.H.'s drug screen established that she had also recently ingested Xanax. S.L. testified that she observed several individuals snorting Xanax during the party.

{¶ 25} S.L. further testified that K.H. appeared to be heavily intoxicated. S.L. testified that K.H. was "stumbling and acting kind of crazy and just wild." Trial Tr. Vol. 1, pg. 169. S.L. testified that on the way home, K.H. passed out in the back seat of the car. S.L. testified that they arrived at K.H.'s house at about 5:30 a.m. S.L. slept at K.H.'s house for an hour after they arrived there. S.L. testified that when she woke up, she observed that K.H. had fallen asleep in a chair in the kitchen and had vomited on the floor around herself.

{¶ 26} Significantly, K.H. testified that during the sexual assault she felt dizzy and weak, and she was unable to form her words correctly. Additionally, K.H. testified that when Jenkins bent her over the toilet and placed his penis in her vagina, she had no

control of her body, and Jenkins had to hold her up during the entire sexual assault, which lasted about ten minutes. When the incident was over, K.H. testified that she passed out for a short time, waking up later, still located in the smaller section of the bathroom. We conclude that the jury had sufficient evidence before it that K.H. was substantially impaired.

{¶ 27} The more difficult question is whether Jenkins knew, or had reasonable cause to believe, that K.H. was substantially impaired. "[W]hen reviewing substantial impairment due to voluntary intoxication, there can be a fine, fuzzy, and subjective line between intoxication and impairment. Every alcohol consumption does not lead to a substantial impairment. Additionally, the waters become even murkier when reviewing whether the defendant knew, or should have known, that someone was impaired rather than merely intoxicated." *Hatten*, 186 Ohio App.3d 286, at ¶ 23, citing *State v. Doss*, 8th Dist. Cuyahoga No. 88443, 2008-Ohio-449, ¶ 18.

{¶ 28} Upon review, we conclude that the State adduced sufficient evidence to establish that Jenkins knew, or had reasonable cause to believe, that K.H. was substantially impaired. S.L. testified that K.H. appeared to be heavily intoxicated. K.H. was stumbling around and acting kind of crazy. S.L. further testified that everyone at the party stayed in the same room together for the entire night. K.H. testified that she saw Jenkins throughout the night. Moreover, K.H. and Jenkins had at least two personal encounters that night. The first encounter occurred when Jenkins asked K.H. about her prescription medications, and they exchanged phone numbers. The second encounter occurred when K.H. and her friends gave Jenkins money to purchase them a second bottle of vodka. Therefore, it is a reasonable inference that Jenkins observed K.H. in her

heavily intoxicated state and was aware of the advanced state of her impairment.

{¶ 29} It is also significant that K.H. was unable to speak properly immediately prior to the sexual assault in the smaller section of the bathroom. K.H. testified that in order to engage in sexual conduct with her, Jenkins had to remove her clothes and position her over the toilet, all while holding her up because she could not support herself. Viewed in a light most favorable to the State, the evidence was sufficient to permit a reasonable jury to find that Jenkins knew, or had reasonable cause to believe, that K.H. was substantially impaired when he sexually assaulted her. Accordingly, the trial court did not err when it overruled Jenkins's post-verdict Crim. R. 29(C) motion for acquittal.

{¶ 30} The evidence in the record supports Jenkins's conviction for Sexual Battery. The jurors had the opportunity to hear and observe all of the witnesses, and they chose to credit the State's witnesses. Determinations of credibility are primarily for the finder of fact. There is substantial evidence in the record that K.H. was substantially impaired and that Jenkins was aware of this when he engaged in sexual activity with her. We conclude that the jury did not lose its way when it chose to credit the testimony of the State's witnesses. We conclude that the evidence does not weigh heavily against a conviction, and that a manifest miscarriage of justice has not occurred.

{¶ 31} Jenkins's First, Second, and Third Assignments of Error are overruled.


## IV. The Trial Court Did Not Err in Overruling Jenkins's *Batson* Objection
## to the State's Peremptory Challenge to a Prospective Juror

{¶ 32} Jenkins's Fourth Assignment of Error is as follows:

THE TRIAL COURT ERRED IN PERMITTING THE PROSECUTING

ATTORNEY TO EXERICSE A PEREMPTORY CHALLENGE AGAINST AN AFRICAN-AMERICAN JUROR IN VIOLATION OF BASTON [sic] V. KENTUCKY.

{¶ 33} In his final assignment, Jenkins argues that the trial court erred when it permitted the State to exercise a peremptory challenge against an African-American juror in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Jenkins asserts that the State's stated reason for excluding the prospective juror, her husband's prior drug-trafficking conviction, is not a sufficiently race-neutral explanation.

{¶ 34} In *Batson*, the U.S. Supreme Court set forth a three-part test for determining whether a prosecutor's use of a peremptory challenge is racially motivated:

"First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Batson,* 476 U.S. at 82. "In order to establish a prima facie case of discrimination, the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race." *State v. Carver,* 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 48 (citations omitted). "The trial court must 'consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present.' " *Id.,* quoting *Batson,* supra, at 96-97.

"Second, once the defendant establishes a prima facie case of

discrimination, the burden shifts to the prosecutor to articulate a race-neutral explanation for the peremptory challenge 'related to the particular case to be tried.' " *Id.* at ¶ 49, quoting *Batson,* supra, at 98. "Although a simple affirmation of general good faith will not suffice, the prosecutor's explanation 'need not rise to the level justifying exercise of a challenge for cause.' " *Id.,* quoting *Batson,* supra, at 97. "In fact, the prosecutor's explanation for striking the prospective juror is not required to be persuasive, or even plausible." *Id.* " 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.,* quoting *Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

"Third, the trial court must determine 'whether the defendant has carried his burden of proving purposeful discrimination.' " *Id.* at ¶ 50, quoting *Batson,* supra, at 82. "In making such a determination, the trial court must decide whether the prosecutor's race-neutral explanation is credible, or instead is a 'pretext' for unconstitutional discrimination." *Id.,* citing *Hernandez v. New York* (1991), 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395. "Because this third stage of the analysis rests largely on the trial court's evaluation of the prosecutor's credibility, an appellate court is required to give the trial court's findings great deference." *Id.* (Citations omitted.)

*State v. Greene*, 2d Dist. Montgomery No. 24307, 2011-Ohio-4541, ¶¶ 7, 8, 9.

{¶ 35} During voir dire in the case before us, the following exchange occurred:

The Court: *** Okay.   Third challenge for the State?

The State: The State would excuse Juror Number 11, Ms. H * * *.

The Court: Is there any objection from the Defense.

The Defense: Just one moment, Your Honor.   I need to refer to that. Yes, that's –

The Court: Do you have an objection?

The Defense: Yes, I do, Your Honor.   I'm sorry.

The Court: Okay.   What is your reason to excuse Juror Number 11?

The State: She, the State had asked questions about people with prior experience.   The State excused Juror Number 2 for this exact reason. That there was [sic] indications on their questionnaires about family members who had been convicted of other crimes.

Juror Number 2 had a GSI.   This juror has drug trafficking and didn't say a word about it when asked by the State, and so given that –

The Court: This is, this is her conviction?

The State: This is her husband's conviction.

The Court: This is her husband's conviction.

The State: She did not mention it was for drug trafficking back in 2003.   There was no mention of it when inquired upon.

The Court: *Well, she wasn't asked, was she, about it*? [Emphasis added.]

The Defense: I didn't think --

The State: The question asked regarding experiences. First was, the first question was regarding family, friends with sexual assault issues, and then regarding drugs and alcohol, any issues with that. She didn't bring that up at all.

The Court: I'm not a 100% sure that carries the day, however, I'm only looking for a neutral reason, and the fact that her husband has been convicted of a crime is a sufficiently neutral reason, so I will permit the peremptory in this regard for the record.

{¶ 36} The State initially predicated its peremptory challenge upon the prospective juror's husband's prior conviction for drug trafficking, likening its decision to exercise its peremptory challenge to this juror to a previous peremptory challenge to another juror based upon a sex-offense conviction. The State then embellished the point, noting that this prospective juror had not mentioned the fact during voir dire. The trial court noted that this prospective juror had not been questioned on the subject of family-member convictions, which would explain why she had not brought it up, but concluded that the fact of her husband's drug-trafficking conviction, even without the embellishment, constituted a race-neutral explanation for the peremptory challenge.

{¶ 37} In a similar case we found that the trial court did not err in denying the defendant's *Batson* objection. *Greene*, 2d Dist. Montgomery No. 24307, 2011-Ohio-4541. Specifically, we found that the trial court was in the best position to evaluate the genuineness of the prosecutor's race-neutral explanation for using a peremptory challenge to remove an African American from the jury for failing to disclose his brother's conviction for drug trafficking seven years prior. *Id.* at ¶ 15. We further recognized that

where the record supports a prosecutor's race-neutral explanation, a trial court properly may conclude that the explanation is not a pretext for racial discrimination. *Id.* In *Greene*, we also noted that the record established that the State had exercised peremptory challenges for the same reason on two similarly situated members of the potential jury. *Id.*, at ¶ 4, fn. 2.

{¶ 38} Initially, we note that while Jenkins objected to the State's exercise of a peremptory challenge against Juror #11 because she is a member of a protected minority class, that fact standing alone is insufficient to establish a prima facie case of discrimination. As previously discussed, the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race. *Carver*, at ¶ 48. For example, apparent racial discrimination may be evident from the record by questions, remarks or comments relating to a single peremptory strike. *Greene*, at ¶ 10. In addition, or in the absence of evident discrimination, a pattern of peremptory strikes against minorities can be sufficient to demonstrate prima facie racial discrimination. *Id.* Here, the record indicates that Jenkins failed to establish any facts or relevant circumstances sufficient to raise an inference that the State utilized its peremptory challenge specifically to exclude Juror #11 on account of her race.[1] Accordingly, the trial court was not obligated to proceed to the second stage of the *Batson* inquiry, which is to inquire of the State whether it has a race-neutral explanation for the

---

[1] Indeed, the record is undeveloped on the *Batson* issue. It does not reflect the race of the prospective juror, for example. From the manner in which the trial court and counsel proceeded, we infer that the prospective juror was a member of a protected minority class, which the State has not disputed in this appeal.

peremptory challenge.   Nevertheless, the trial court proceeded to the second stage, without objection by the State.

{¶ 39} We conclude that the record supports the State's race-neutral explanation for exercising a peremptory challenge against Juror #11.   Specifically, the State's race-neutral explanation was that Juror #11's husband had been convicted of drug trafficking in 2003.   The trial court is in the best position to determine whether the proffered, race-neutral explanation is non-pretextual, i.e., whether it was the real reason why the State exercised the peremptory challenge.   In the case before us, the trial court accepted the State's explanation, and we find nothing in the record to suggest that the trial court erred in that regard.   We conclude, therefore, that the trial court did not err when it permitted the State to exercise a peremptory challenge against Juror #11.

{¶ 40} Jenkins's Fourth Assignment of Error is overruled.


### V. Conclusion

{¶ 41} All of Jenkins's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . .

WELBAUM, J., concurs.

DONOVAN, J., dissenting:

{¶ 42} I disagree.   The State did not base its challenge of Juror Number 11 on a fact contained in her questionnaire.   Rather, the State suggested that "the State had asked questions about people with prior experience."   Juror Number 11 "didn't say a word when asked by the State and so given that - ". . . "there was no mention of it when

inquired upon." The State's position was that Juror Number 11 had been less than candid in voir dire and Juror Number 2 was excused for "this exact reason." However, Juror Number 2 failed to orally disclose the GSI conviction when a specific inquiry was made to the entire panel on the subject of sexual assaults:

> The State: The allegation in this case involves sexual assault. Without going into any details about the fact that that is what this case is going to revolve around, *does anyone have concerns either personally themselves, they have a family member, they've had a friend who's been subject whether they were the victim, whether they were a witness, whether they were a Defendant in the case, does anyone sitting here today have any concerns knowing that this is a sexual assault case?*

Transcript of Proceedings, November 17, 2014, p. 52.

**{¶ 43}** Furthermore, the majority's suggestion that *Greene* is similar overlooks an important distinction. In *Greene*, the prosecutor *asked* the challenged juror about his brother's conviction, specifically would the juror hold the conviction against the State? The response elicited from the juror caused concern for the State, but not the trial court.

**{¶ 44}** We know from the record, including the exhibits, that Jenkins is a member of a protected class. He is African-American and the complaining witness is a Caucasian juvenile. As we emphasized in *State v. Manns*, 169 Ohio App.3d 687, 2006-Ohio-5802, 864 N.E.2d 657 (2d Dist.), "the State of Ohio must be scrupulous in building a record that legitimately demonstrates its articulated concern."

{¶ 45} It was not the trial court's duty to search for or substitute a distinct race neutral reason.   This was constitutional error in my view, and only undermines confidence in a system which must be fundamentally fair.   I would reverse.

. . . . . . . . . .


Copies mailed to:

Nathaniel R. Luken
David R. Miles
Hon. Stephen A. Wolaver