[Cite as *State v. Jenkins*, 2017-Ohio-693.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

STATE OF OHIO                              :
                                          :
    Plaintiff-Appellee              :      C.A. CASE NO.   2016-CA-10
                                          :
v.                                        :      T.C. NO. 15CR411
                                          :
JOSEPH E. JENKINS                         :      (Criminal appeal from
                                          :       Common Pleas Court)
    Defendant-Appellant             :
                                          :

. . . . . . . . . .

**O P I N I O N**

Rendered on the ____24th____ day of _____February_____, 2017.

. . . . . . . . . .

ELIZABETH A. ELLIS, Atty. Reg. No. 0074332, Civil Division Chief, 61 Greene Street, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee

ANN M. RINGLER, Atty. Reg. No. 0082305, P. O. Box 3025, Springfield, Ohio 45501
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} Defendant-appellant Joseph E. Jenkins appeals his conviction and sentence for one count of murder, in violation of R.C. 2903.02(B), for causing the death of the victim, Andre Winston, as the proximate result of committing a felonious assault with a deadly weapon, in violation of R.C. 2903.11(A)(2).   Jenkins filed a timely notice of appeal with

this Court on March 17, 2016.

{¶ 2} The incident which forms the basis for the instant appeal occurred on the night of July 22, 2015, where a group of friends and acquaintances had gathered in the parking lot of the Fairborn Apartment Complex in Fairborn, Greene County, Ohio. Among those gathered were two individuals identified as "Mark B." and Timmie Ball. At some point, Mark B. and Ball got into an altercation and began pushing and shoving each other. Jenkins (a/k/a "Bama") attempted to intervene in the fight between the two men and began arguing with a woman named Courtney Howard (a/k/a "Kush") who was also present where the people had gathered.

{¶ 3} Jeremy Harrington, another individual who was present that night, testified that he observed that Howard had taken her cellphone out and was recording or pretending to record the altercation between Mark B. and Ball. This action on the part of Howard apparently upset Jenkins, and he began calling her names and threatening her physically. Before the situation could escalate any further, Andre Winston intervened and told Jenkins to leave Howard alone. Harrington and Howard both testified that Jenkins then punched Winston in the face. Winston quickly recovered from the blow and punched Jenkins in the face, knocking him down. Jenkins got up off the ground, stated "I've got something for you," and ran into a nearby apartment.

{¶ 4} Approximately five minutes later, Harrington and Winston were standing near Harrington's car getting ready to leave the apartment complex when Jenkins returned to the parking lot. Jenkins approached Winston with one hand extended as if to shake hands while he kept his other hand behind his back. Jenkins then took his hand from behind his back and stabbed Winston in the chest with a knife. After being stabbed,

Winston managed to stay on his feet for approximately thirty seconds before falling down. Winston died at the scene. Immediately after stabbing Winston, Jenkins fled to another part of the apartment complex.

{¶ 5} After witnessing Jenkins stab Winston, Howard called 911. Shortly thereafter, Sergeant Gary Mader of the Fairborn Police Department was dispatched to the apartment complex. Upon his arrival, Sgt. Mader located Winston where he had fallen after being stabbed. While he was attempting to assist Winston who was being attended to by paramedics, Sgt. Mader testified that he heard an individual, later identified as Jenkins, yelling "I'm the one you want," or words to that effect. When Sgt. Mader went over to speak with him, Jenkins admitted that he was the person who stabbed Winston. Sgt. Mader testified that Jenkins appeared lucid, excited, and anxious to speak with the police. Sgt. Mader further testified that he and other officers located the knife blade where it broke off in Winston's chest when he was stabbed by Jenkins. Sgt. Mader testified that they were unable to locate the handle of the blade. Thereafter, Jenkins was placed under arrest and taken to jail.

{¶ 6} On July 31, 2015, Jenkins was indicted for the murder of Winston. At his arraignment on August 7, 2015, Jenkins pled not guilty to the charged offense. On August 13, 2015, Jenkins entered a plea of not guilty by reason of insanity (NGRI) and filed a motion for a competency and sanity evaluation. Jenkins was evaluated twice, first by a doctor appointed by the trial court from the Forensic Psychiatry Center for Western Ohio, and a second time by a doctor chosen by Jenkins. After evaluating Jenkins, both doctors found him to be sane at the time that the offense was committed and competent to stand trial. On December 10, 2015, the trial court issued a judgment entry finding

Jenkins competent to stand trial.

{¶ 7} Jenkins' jury trial began on February 29, 2016, and ended on March 2, 2016. Jenkins testified at trial, asserting self-defense as his affirmative defense. Jenkins was found guilty of murder as charged in the indictment. On March 15, 2016, the trial court sentenced Jenkins to fifteen years to life in prison.

{¶ 8} It is from this judgment that Jenkins now appeals.

{¶ 9} Jenkins' first assignment of error is as follows:

{¶ 10} "THE TRIAL COURT ABUSED ITS DISCRETION AND THUS COMMITTED ERROR BY ALLOWING EXHIBIT 11 TO BE VIEWED BY THE JURY AND ADMITTED INTO EVIDENCE, IN VIOLATION OF OHIO RULE OF EVIDENCE 403(A)."

{¶ 11} In his first assignment, Jenkins contends that the trial court abused its discretion in admitting, over his objection, State's Exhibit 11, which depicted an interior anatomical view of the stab wound suffered by Winston which ultimately caused his death. The photo depicts Winston's internal organs, the blood accumulated in the chest cavity caused by the injury, and the protruding knife blade. Specifically, Jenkins argues that the photo should not have been admitted because its probative value was substantially outweighed by the danger of unfair prejudice which resulted from its gruesome nature. Evid.R. 403(A). The trial court concluded that the photograph was necessary to help the jury understand the coroner's testimony regarding medical issues and the cause of death, and that its probative value was not substantially outweighed by the danger of unfair prejudice. We agree.

{¶ 12} The admission or exclusion of evidence such as photographs is left to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of

that discretion.   *State v. Morales,* 32 Ohio St.3d 252, 257, 513 N.E.2d 267 (1987); *State v. Whitfield,* 2d Dist. Montgomery No. 22432, 2009–Ohio–293, ¶ 122.

{¶ 13} "In determining the admissibility of a photograph under Evid.R. 403, 'a trial court may reject an otherwise admissible photograph which, because of its inflammatory nature, creates a danger of prejudicial impact that substantially outweighs the probative value of the photograph as evidence.'   Absent such a danger, the photograph is admissible.   '[T]he fact that a photograph may be considered gruesome is not, in and of itself, grounds for preventing its introduction into evidence.'   The trial court has broad discretion in balancing the probative value against the danger of unfair prejudice, and its determination will not be disturbed on appeal absent a clear abuse of discretion." *State v. Herron*, 2d Dist. Montgomery No. 19894, 2004-Ohio-773, ¶ 64, citing *State v. Reeves*, 2d Dist. Montgomery No. 16987, 1999 WL 129469 (Mar. 12, 1999).

{¶ 14} "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. *Huffman v. Hair Surgeon, Inc.,* 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985).   It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

{¶ 15} A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo,* would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 16} The State had the burden to prove, beyond a reasonable doubt, that Jenkins knowingly stabbed Winston in the chest and this action, in turn, caused the internal injuries which brought about his death. The photograph was clearly probative of such matters and was presented during the testimony of Dr. Christopher Kiefer, who performed the autopsy, for the purpose of explaining to the jury his opinion concerning the cause of Winston's death. Dr. Kiefer is a forensic pathologist employed at the Montgomery County Coroner's Office located in Dayton, Ohio. With respect to State's Exhibit 11, the State elicited the following testimony:

The State: Okay. And let me start with this one, Exhibit 11. Is that the same exhibit that's on the screen right there?

Dr. Kiefer: Yes, it is.

Q: All right. And what's that a photograph of?

A: So this photograph represents the blade still in the decedent's body after removing the chest plate.

***

Defense Counsel: Your Honor, may we approach?

The Court: Certainly.

(Whereupon, colloquy ensued at the Bench outside of the hearing of the Jury.)

**AT BENCH**:

Defense Counsel: I know that the Court has already ruled, but I'd like to renew my objection to this line.

The Court: Okay. You got that, Julie? Okay. Thank you.

**OPEN COURT**:

The Court: Please proceed.

The State: Thank you.

The Court: You're welcome.

The State: All right. So I think you were explaining that you saw the blade in the chest?

Dr. Kiefer: Yes.

\*\*\*

Q: Can you explain the path of the blade?

A: Yes. The blade enters the anterior chest wall, the front of the chest, enters the pericardial sac, which is the membrane that covers the heart. It goes through the heart very near its, its tip so the pointed part of the heart, and then it continues through the pericardial sac again into the diaphragm and through the diaphragm into the left side of the liver, all the way through the liver and abuts the, or the injury ends on the anterior surface of the stomach.

Q: What kind of force would it take for a knife like that to go through all those organs?

A: The organs themselves are soft, but I forgot to mention in the anterior chest wall, there is a fracture or a, a cut into the cartilage that connects the seventh left rib to the sternum, which is the breast bone.

Q: So the path would be through the rib cage?

A: Right.

Q: And then the broken bone, then through the organs?

A: Correct.

Q: All right. What kind of force would be needed for that kind of pathway?

A: Cutting through the cartilage is not as difficult as cutting through bone. But it would have been the most difficult or the most resistance of that path of the, of the blade.

Q: Is there something you can compare it to?

A: It's hard, because I haven't actually compared the force of putting a knife through cartilage versus another object, but I imagine that it's something similar to a knife going through a rubber tire.

Q: Like a car tire?

A: Like a car tire.

Q: All right. So you said you went through the rib cage into the heart, and then you indicated that it defected the heart in some fashion?

A: Yeah.

Q: And what, what was that again?

A: It made approximately a one inch long cut in the very bottom or distal tip of the heart on the right side, and that caused a communication or it caused leakage of blood from the inside of the heart to the chest cavity.

Q: And did you observe blood in the chest cavity?

A: Yes, I did.

Q: And how, how much blood was in the chest cavity?

A: Both chest cavities, the right and left chest, which denote or

indicate where the lungs are, so the right lung sits in the right chest that had approximately 400 milliliters of blood, which is slightly less than half a liter.

The left chest where the left lung would normally be contained over one liter of blood or 1,300 milliliters of blood.

Q: The combined of the two, how much of that is his blood for his whole body?

A: That combined would be 1,700 milliliters. There was also blood in the abdominal cavity from, I believe to be the liver or blood that leaked from the chest cavity through the hole in the diaphragm down into the abdominal cavity.

That was another 200 milliliters, and there was another 150 milliliters that was surrounding the heart, and so all together that's over two liters of blood.

Q: And how much does the human body have in it to begin with?

A: Given [Winston's] body weight of 222 or 220 pounds that would have been close to a third, so he –

Q: A third of his blood was –

A: Third of his blood volume.

Q: -- in his chest, or in his body cavity?

A: Uh-huh.

Q: Where it's not supposed to be?

A: That's correct.

Trial Transcript, p. 469-474.

{¶ 17} In our view, the trial court properly admitted the autopsy photograph at issue in this case because it helped the jury to understand the coroner's testimony regarding the cause of Winston's death, and the photograph was relevant and probative of the allegation that Jenkins caused his death by stabbing him in the chest. The photograph, which depicted the internal damage done to Winston which resulted in his death, depicted things the other autopsy photographs did not. *Whitfield* at ¶ 125. The probative value of the autopsy photograph was not substantially outweighed by the danger of unfair prejudice. As we stated in *State v. Wade,* 2d Dist. Montgomery No. 21530, 2007–Ohio–1060, ¶ 35:

> Autopsy photos are inherently prejudicial when they depict gruesome, graphic wounds, but when offered to prove elements of the offense that the State has the burden of proving, they are usually not *unfairly* prejudicial. That is the case here.

{¶ 18} Accordingly, the trial court did not abuse its discretion in admitting State's Exhibit 11.

{¶ 19} Jenkins' first assignment of error is overruled.

{¶ 20} Jenkins' second assignment of error is as follows:

{¶ 21} "THE TRIAL COURT ERRED BY OVERRULING DEFENSE COUNSEL'S OBJECTION TO THE STATE'S PEREMPTORY CHALLENGE IN REGARD TO JUROR NUMBER ONE UNDER *BATSON V. KENTUCKY.*"

{¶ 22} In his second assignment, Jenkins argues that the trial court erred when it, over defense counsel's objection, permitted the State to exercise a peremptory challenge against a "non-Caucasian" juror, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct.

1712, 90 L.Ed.2d 69 (1986). During voir dire, the State exercised a challenge to the juror in question, who is apparently non-Caucasian, on the basis that he holds an engineering degree and stated that he had no one to cover the classes that he teaches. Jenkins contends that the State failed to offer a sufficiently race-neutral explanation necessary to excuse the "non-Caucasian" juror.

{¶ 23} The Supreme Court of Ohio has addressed the appropriate standard of review for a claim of racial discrimination in jury selection, as follows:

Review of a *Batson* claim largely hinges on issues of credibility. Accordingly, we ordinarily defer to the findings of the trial court. See *Batson [v. Kentucky,* 476 U.S. 79,] at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21 [1986]. Whether a party intended to racially discriminate in challenging potential jurors is a question of fact, and in the absence of clear error, we will not reverse the trial court's determination.

*Hicks v. Westinghouse Materials Co.,* 78 Ohio St.3d 95, 102, 676 N.E.2d 872 (1997), citing *Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct.1859, 114 L.Ed.2d 395 (1991); *State v. Hernandez,* 63 Ohio St.3d 577, 583, 589 N.E.2d 1310 (1992).

{¶ 24} When reviewing an argument that the trial court should not have accepted the grounds for the peremptory challenge, "[t]he finding of the trial court, because it turns largely on the evaluation of credibility, is entitled to deference on appeal and will not be reversed unless clearly erroneous." *State v. Jones*, 2d Dist. Montgomery No. 26819, 2016-Ohio-5728, ¶ 8, citing *State v. Herring,* 94 Ohio St.3d 246, 257, 762 N.E.2d 940 (2002).

{¶ 25} In *Batson,* the U.S. Supreme Court set forth a three-part test for determining

whether a prosecutor's use of a peremptory challenge is racially motivated:

"First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race." *Batson,* 476 U.S. at 82. "In order to establish a prima facie case of discrimination, the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race ." *State v. Carver,* 2d Dist. Montgomery No. 21328, 2008–Ohio–4631, ¶ 48 (citations omitted). "The trial court must 'consider all relevant circumstances in determining whether a prima-facie case exists, including statements by counsel exercising the peremptory challenge, counsel's questions during voir dire, and whether a pattern of strikes against minority venire members is present.' " *Id.,* quoting *Batson,* supra, at 96–97.

"Second, once the defendant establishes a prima facie case of discrimination, the burden shifts to the prosecutor to articulate a race-neutral explanation for the peremptory challenge 'related to the particular case to be tried.' " *Id.* at ¶ 49, quoting *Batson,* supra, at 98. "Although a simple affirmation of general good faith will not suffice, the prosecutor's explanation 'need not rise to the level justifying exercise of a challenge for cause.' " *Id.,* quoting *Batson,* supra, at 97. "In fact, the prosecutor's explanation for striking the prospective juror is not required to be persuasive, or even plausible." *Id.* " 'At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a

discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " *Id.,* quoting *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

"Third, the trial court must determine 'whether the defendant has carried his burden of proving purposeful discrimination.' " *Id.* at ¶ 50, quoting *Batson,* supra, at 82. "In making such a determination, the trial court must decide whether the prosecutor's race-neutral explanation is credible, or instead is a 'pretext' for unconstitutional discrimination." *Id.,* citing *Hernandez v. New York* (1991), 500 U.S. 352, 363, 111 S.Ct. 1859, 114 L.Ed.2d 395. "Because this third stage of the analysis rests largely on the trial court's evaluation of the prosecutor's credibility, an appellate court is required to give the trial court's findings great deference." *Id.* (Citations omitted.)

*State v. Greene,* 2d Dist. Montgomery No. 24307, 2011–Ohio–4541, ¶¶ 7, 8, 9*.*

{¶ 26} During voir dire, the following exchange occurred:

The State: Okay. And Juror Number 15, how are you?

Juror Number 15: I'm good. Thank you.

Q: All right. What do you teach?

A: Electrical engineering.

Q: Yeah, far above anything I've got going on in this brain. [You] [w]ould be selected for four days, would that give you any concerns about your classes if you were to be sitting here?

A: No, we'll work it out.

Q: Is there anyone that can [pinch] hit for you?

A: No.

Q: Okay. But your students would probably be happy if I selected you?

A: Probably.

Q: All right. Any questions at all about what we've gone over so far?

A: No.

Q: All right. You can be fair and impartial?

A: Yes.

***

The Court: All right. Then we'll go forward with the perempts, and we'll start off with the first for the State.

The State: The State would excuse Juror Number 1, [M.D.]

The Court: Okay. Into the Number 1 spot will go [M. A.] [formerly Juror Number 15].

***

The Court: Okay. You pass on two. All right. Third challenge for the State.

The State: The State would excuse Juror Number 1, [M. A.]

Defense Counsel: Your Honor, I would ask that the, I would make a Batson challenge at this point to that Juror. He is our only non-Caucasian Juror. Ask the State to present a race neutral reasoning for that.

The State: And, Your Honor, we would object on two bases.

Pursuant to *State v. Jenkins* [2d Dist. Greene No. 2015-CA-6, 2015-Ohio-5167] that allegation of that alone is not enough for a prima facie case to request the State to make its reasoning on that.

The Court: Are you saying the nature of his, who he is doesn't apply?

The State: Well, there's A, he's not a member of this particular ethnic class, as well as under the recent Second District ruling that alone is not enough to demonstrate prima facie case to get to the second prong of Batson.

The Court: Oh, okay. You're just saying *Batson* doesn't cover whatever he is?

The State: That. In addition, the Defense – just alleging that alone is not enough, even if he was of the protected class in question.

There has to be a demonstration in the record of the State's attitude, comments, [or] questions that would demonstrate something above and beyond just the nature of who, he himself generally.

The Court: I don't think *Batson* requires that, does it?

\*\*\*

The State: Specifically, the State would turn the Court's attention to paragraph 38, because actually they dinged me for not objecting in that case, Your Honor.

The Court: I'm sorry. What was that?

The State: Paragraph 38. The Second District noted, that we – initially we note that while Jenkins objected to the State's exercise of a

peremptory challenge against Juror Number 11, because she's a member of a protected minority class, that fact alone is insufficient to establish a prima facie case of discrimination, but since I didn't object, hence the –

The Court: Thank you.

The State: -- ruling for objecting to that case.

The Court: Well, it also indicates in here – I just started reading it – but it says, we conclude the record supports the overruling of the *Batson's* objection because the State offered a race neutral basis for its peremptory challenge.

Well, I'll tell you, this was my case –

The State: Yes.

The Court: -- and I presume that during the course of that case, I asked the State to provide a race neutral response.   Do you have anything to say about that?

The State: I do.   And again, as the Second District indicated that the facts of asserting a protected class alone is not enough, but nonetheless the State will provide a race neutral reason in this case.

[M. A.] indicated that he's a professor.   There's no one to cover his classes, and additionally, the nature of his teaching material, engineering, given the State's experience with individuals who have engineering degrees, they are often difficult as Jurors.

The Court: Any response –

Defense Counsel: Your Honor –

The Court: -- in regard to your motion.

Defense Counsel: -- the fact that he's an engineer and is maybe a difficult Juror to make the State hold themselves to that burden, I mean, I think that's, that to me is a, that, that's not a – certainly wouldn't pass the for cause element, for sure.

I mean, engineers are qualified.   I mean, he's, he's indicated, yes, that he does teach a class, and he didn't have anybody to cover his class; but he said he would be a fair and impartial Juror and that they would handle it, so I think that takes out the first argument that the Prosecution – at some point did he say this would be an undue burden.

When asked about it by the State, he said, yes, you know, my classes, I don't have anybody to cover my class, but I can still sit.   I just, I guess, I don't understand the engineer argument.

The Court: Well –

Defense Counsel: And, again, he does teach at Central State.   He is a, I don't think there is, there is any question he is a member of a protected class.   I just don't think that the State has a valid race neutral argument.

The Court: Well, I think I'll answer the question two ways.   First off, as stated in Mr. K-Vonne Jenkins' case, the Defendant must make a prima facie [case] that the Prosecutor is exercising peremptory challenges on the basis of race.

If we take the plural of the challenges, that would fail in this instance, because that hasn't occurred so far.   This is the first challenge that has

been raised regarding this matter.

So there's a real question in the Court's mind whether or not the Defendant has even established a prima facie case of discrimination such that the burden would have to shift to the Defense.

*Batson* doesn't say that a minority class is prevented from being peremptory challenged. It says we do an evaluation for that.

So, first off, I'll suggest, I don't believe the first threshold has been made, but even if we assume that to be the case, and the State has the burden of providing a race neutral explanation, I am satisfied that – actually I was a little surprised to a degree that there wasn't an agreement to have this individual removed for cause because of his teaching schedule; but I understood that's not an automatic challenge for cause; but I'm satisfied both for the ability for the witness to give his attention to the case in light of his employment responsibilities; but, I guess, I should probably say, having sat in the Prosecutor's chair in the past, I appreciate the sentiment of the State's position, which has been for a long, long time a consideration of the State to have individuals who are more scientifically, mathematically and straight line inclined to be removed from a Jury peremptorily because not all cases fit that simple design as an engineer.

I think it's fair for the State to make the argument and take the position that an engineer is someone that they prefer not to have on the Jury, *so I will find that the peremptory challenge is not improper, and I'll permit the State to exercise the challenge as to [M. A.],* who is Juror,

currently sitting as Juror Number 1, so into the Number 1 spot will now go

[W. D.]   So we'll proceed to the third challenge for the Defense.

\*\*\*

**{¶ 27}** As we have previously held, a defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race. *State v. Carver,* 2d Dist. Montgomery No. 21328, 2008–Ohio–4631, at ¶ 48. Apparent racial discrimination may be evident from the record by questions, remarks or comments relating to a single peremptory strike. *Greene,* at ¶ 10.   In addition, or in the absence of evident discrimination, a pattern of peremptory strikes against minorities can be sufficient to demonstrate prima facie racial discrimination. *Id.*   In the instant case, the record indicates that Jenkins failed to establish any facts or relevant circumstances sufficient to raise an inference that the State utilized its peremptory challenge specifically to exclude Juror Number 1 on account of his apparent non-Caucasian status.  Accordingly, the trial court correctly found that it was not obligated to proceed to the second stage of the *Batson* inquiry, which is to inquire of the State whether it has a race-neutral explanation for the peremptory challenge.   *See State v. Jenkins*, 2d Dist. Greene No. 2015-CA-6, 2015-Ohio-5167, ¶ 38.   Nevertheless, once the proponent explains the challenge and the trial court rules on the ultimate issue of discrimination, whether or not a prima facie case was established becomes moot. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1999).

**{¶ 28}** However, even if we assume that the trial court *was* obligated to proceed to

the second prong of the *Batson* inquiry, we conclude that the record supports the State's race-neutral explanation for exercising a peremptory challenge against Juror Number 1. As previously discussed, the State's race-neutral explanation was that Juror Number 1 holds an engineering degree and individuals with that type of degree are often difficult jurors. The State also pointed out that Juror Number 1 stated that he had no one to cover the classes that he teaches. The record reflects that the trial court did not simply take the State's purported race-neutral explanations at face value but rather, probed the prosecutor's proffered explanations in order to evaluate their credibility, ultimately finding them to be credible and not pretextual. The trial court was in the best position to weigh the credibility of the state's explanation in determining whether the State exercised its peremptory challenges with a discriminatory intent. Following a thorough review of the record, we cannot say that the trial court's decision to allow the State to exercise its peremptory challenge with respect to Juror Number 1 was clearly erroneous.

{¶ 29} Jenkins' second assignment of error is overruled.

{¶ 30} Jenkins' third and final assignment of error is as follows:

{¶ 31} "APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AS SELF-DEFENSE WAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE."

{¶ 32} In his final assignment, Jenkins argues that his conviction for the murder of Winston is against the manifest weight of the evidence because he established by a preponderance of the evidence that he acted in self-defense.

{¶ 33} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and

all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶ 34}** This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *State v. Bradley,* 2d Dist. Champaign No. 97–CA–03, 1997 WL 691510 (Oct. 24, 1997).

**{¶ 35}** "Self-defense is an affirmative defense which the accused has the burden to prove by a preponderance of the evidence. R.C. 2901.05(A); (citation omitted). 'In order to establish self-defense, a defendant must prove: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.' " (Citations omitted). *State v. Kleekamp,* 2d Dist. Montgomery No. 23533, 2010-Ohio-1906, ¶ 52.

**{¶ 36}** Upon review, we conclude that Jenkins' conviction is not against the manifest weight of the evidence. The credibility of the witnesses and the weight to be given their testimony are matters for the jury to resolve. Jenkins presented only minimal evidence in the form of his own testimony that he acted in self-defense when he

stabbed Winston in the chest. The jury did not lose its way simply because it chose to believe the State's witnesses, including the eyewitness testimony of Jeremy Harrington, Courtney Howard, and Tiffany Bostick who all testified that after the initial confrontation between Jenkins and Winston, Jenkins left the area and went inside an apartment at the complex. The same State's witnesses also testified that Jenkins reappeared a short time later and approached Winston, fatally stabbing him. Thus, the jury could reasonably conclude that Jenkins initiated the second confrontation. The jury could also reasonably conclude that Jenkins was never in imminent danger of death or great bodily harm. Simply put, Jenkins could have left the scene of the fray at any time, and in fact, returned in order to confront the victim. Furthermore, Jenkins acknowledged that he never observed Winston with a weapon. Jenkins did leave and readily admitted that he was the only individual to brandish a weapon during the second confrontation. Having reviewed the entire record, we cannot clearly find that the evidence weighs heavily against a conviction, or that a manifest miscarriage of justice has occurred.

{¶ 37} Jenkins' third and final assignment of error is overruled.

{¶ 38} All of Jenkins' assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Elizabeth A. Ellis
Ann M. Ringler
Hon. Stephen A. Wolaver